# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| NIMA NAZERZADEH, | § | |
| (a/k/a NIMA NASERZADEH), | § | |
| (Reg. #39423-179) | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-08-0499 |
| | § | |
| HARRIS COUNTY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Nima Nazerzadeh, a former federal inmate,[1] sued in February 2008, alleging that he was subjected to excessive force while he was a pretrial detainee at the Harris County Jail ("HCJ"). Nazerzadeh, represented by counsel, sued Harris County and various John Doe defendants. Harris County answered, (Docket Entry No. 4), and moved for summary judgment, (Docket Entry No. 26); Nazerzadeh responded, (Docket Entry No. 32); and Harris County replied, (Docket Entry No. 37). Based on the pleadings; the motion, response, and reply; the summary judgment record; and the applicable law, this court grants Harris County's motion for summary judgment and dismisses

---

[1]
        On February 8, 2006, Nazerzadeh was indicted for two counts of distribution of child pornography and one count of possession of child pornography involving the sexual exploitation of minors. (Criminal Action Number 4:06-CR-030-1). On February 13, 2006, Nazerzadeh appeared before United States Magistrate Judge Stephen Smith. A detention hearing was held on February 17, 2006, and Nazerzadeh pleaded not guilty. On August 14, 2006, Nazerzadeh pleaded guilty to all three counts and was sentenced to 60 months in the custody of the Bureau of Prisons, a lifetime supervised release term, and a $100.00 special assessment on each count. Online research reveals that Nazerzadeh was released from the BOP on August 19, 2010.

Nazerzadeh's claims against the John Doe defendants.  An order of dismissal is separately entered. The reasons for this ruling are stated in detail below.

## I.      Background

Nazerzadeh alleges that on February 12, 2006 he was arrested on a federal charge of possessing and distributing child pornography.  Nazerzadeh explains that he is short, thin, and has been diagnosed with Asperger's, a form of autism.  Nazerzadeh alleges that while he was being booked into the HCJ at the Inmate Processing Center ("IPC"), he was assaulted by several HCJ employees and that other employees and law enforcement officers, including a United States Deputy Marshal, were present but did nothing. Nazerzadeh alleges that he suffered bruising and pain.

Nazerzadeh alleges that the Harris County Sheriff's Office has a custom or policy of permitting or condoning the use of excessive force on pretrial detainees.  He alleges that there are no policies or no effective policies to prevent the use of excessive force; that Harris County's system of monitoring deputies is insufficient and emboldens the use of excessive force; and that the failure to train or discipline allows the use of excessive force in the HCJ.  Nazerzadeh alleges that the defendants violated his First, Fourth, and Fourteenth Amendment rights.  He alleges that despite evidence that he was "severely beaten" without reason, there was no retraining or discipline to any Harris County deputy or jail employee for the excessive force or for concocting a "false story" that Nazerzadeh had first attacked an officer.  Citing *Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir. 1985), *cert. denied,* 480 U.S. 916 (1987), Nazerzadeh also argues that the defendants' conduct constituted ratification of a custom, policy, practice and procedure by Harris County of such conduct. Nazerzadeh seeks unspecified compensatory and punitive damages, an order that Harris County install a second camera at the IPC, and an order that all videos be kept for three years.

Harris County moves for summary judgment as to all of Nazerzadeh's claims.  Each claim and response is evaluated below.

## II.    The Standard of Review

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).   "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc*., 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir.

2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling

on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150

(2000); *Anderson,* 477 U.S. at 254-55.

      Once the moving party has made an initial showing that there is no evidence to support the

nonmoving party's case, the party opposing the motion must come forward with competent summary

judgment evidence of the existence of a genuine fact issue.  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio,* 475 U.S. 574, 586 (1986).   Mere conclusory allegations are not competent summary

judgment evidence, and thus are insufficient to defeat a motion for summary judgment.  *Eason v.*

*Thaler,* 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences, and

unsupported speculation are not competent summary judgment evidence.  *See Forsyth v. Barr*, 19

F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871 (1994).  When the moving party has met its

Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on

the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record

and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119

(5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material

facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"

*Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).   The party opposing summary

judgment is required to identify specific evidence in the record and to articulate the precise manner

in which that evidence supports his claim.  *Ragas*, 136 F.3d at 458.

      Rule 56 does not impose a duty on the court to "sift through the record in search of evidence"

to support the nonmovant's opposition to the motion for summary judgment.  *Id.; see also Skotak*

*v. Tenneco Resins, Inc.,* 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).

4

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment."  *Anderson,* 477 U.S. at 248.   Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.*  If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex,* 477 U.S. at 322-23.

Harris County provided the following summary judgment evidence:

(1)     Nazerzadeh's original complaint;

(2)     Nazerzadeh's responses to defendant's interrogatories and requests for production;

(3)     affidavit of  Michael Medina, a Harris County Sheriff's Deputy;

(4)     affidavit of  Noel Araguz, a Harris County Sheriff's Office employee;

(5)     affidavit of Lois Wiltz, LVN, a Harris County Sheriff's Office employee;

(6)     affidavit of Harris County Sheriff's Office Administrative Sergeant Mark Wachs with video attached;

(7)     affidavit of Jay Coons, Ph.D., Commander of the HCJ;

(8)     affidavit of Michael Seale, M.D., Harris County Sheriff's Office Executive Director for Health Services;

(9)     excerpts from the deposition of Charles Granger, a Harris County Sheriff's Office employee; and

(10)    excerpts from the deposition of Joseph Cormier, a Harris County Sheriff's Office employee.

Nazerzadeh provided the following summary judgment evidence:

    (1)     the use-of-force DVD;

    (2)     his own declaration;

    (3)     a booking photograph;

    (4)     his Harris County Jail clinic records;

    (5)     a *Houston Chronicle* article dated March 16, 2007;

    (6)     a Rule 30(b)(6) deposition of Sergeant Wachs on Harris County's policies and practices;

    (7)     deposition testimony of Sergeant Wachs;

    (8)     deposition testimony of Sergeant Araguz; and

    (9)     an expert report by Roger Clark.

(Docket Entry Nos. 32, 33, 35, and 36).

Nazerzadeh objects to the use of exhibits 3, 4, 5, 6, 7, 8, 9, and 10 to Harris County's motion for summary judgment because they are from interested witnesses. (Docket Entry No. 32, Plaintiff's Response, p. 2). A party may not defeat a properly supported motion for summary judgment merely by raising generalized questions about the credibility of the movant's affiants. *Robinson v. Cheney,* 876 F.2d 152, 162 (D.C. Cir. 1989). An objection that an affiant is an "interested party" is not sufficient to exclude the evidence. *Martinez v. Prestige Ford Garland, L.P.*, 2004 WL 1194460, *4, n.7 (N.D. Tex. May 28, 2004). An affidavit that is clear, direct, and free from contradictions and inconsistencies, and based on personal knowledge, may be considered as competent summary judgment evidence. *See Gibson v. Liberty Mutual Group,* 129 Fed. Appx. 94, 95-96 (5th Cir. 2005); *Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004); *Lee v. Nat'l Life Assurance Co. of*

6

*Canada,* 632 F.2d 524, 529 (5th Cir. 1980).  A court may not, of course, grant summary judgment relief based on credibility determinations.  *Id.*, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The objection is overruled.

### III.    The Excessive Force Claim

#### A.        The Legal Standard

Nazerzadeh alleges that Harris County deprived him of due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.  "Pretrial detainees and convicted prisoners . . . look to different constitutional provisions for their respective rights to basic needs such as medical care and safety." *Hare v. City of Corinth,* 74 F .3d 633, 639 (5th Cir. 1996) (en banc).  As a pretrial detainee, Nazerzadeh was covered by the Fourteenth Amendment, not the Eighth Amendment.  *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc).  The standard for analyzing an excessive force claim under 42 U.S.C. § 1983 is the same for a pretrial detainee invoking the Due Process Clause or a convicted prisoner invoking the Eighth Amendment. *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993).

The standards for analyzing a pretrial detainee's claim of constitutional violations depend on whether the claim challenges the conditions of confinement or an episodic act or omission by the jail personnel. *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc).  In jail-condition cases, the perpetrator's state of mind is not at issue because the intent is manifest in the challenged condition, practice, rule, or restriction. *See Hare*, 74 F.3d at 644-45.  This first category includes such claims as "where a detainee complains of the number of bunks in a cell or his television or mail privileges." *Scott*, 114 F.3d at 53.  The wrong of which the detainee complains, the unconstitutional infliction of punishment, is the condition itself.  There is a direct link between the policy supporting

the condition and the actual harm suffered by the detainee.  *See id.* ("In many jail condition cases, the conditions themselves constitute the harm.  This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions.").  An episodic-act-or-omission case usually involves a complaint of an unconstitutional act or omission of an individual official and a policy, custom, or rule (or lack thereof) that permitted or caused the violation.  *Flores v. Cnty. of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997); *Scott*, 114 F.3d at 53.  In this category of cases, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission."  *Id.*  Episodic-act-or-omission cases, like conditions-of-confinement claims, implicate municipal policy.  In episodic-act-or-omission cases, the policy is one step removed from the individual act or omission that directly caused plaintiff's alleged harm.  *See id.* ("[T]he actual harm of which [plaintiff] complains is . . . an episodic event perpetrated by an actor interposed between [plaintiff] and the city, but allegedly caused or permitted by the aforesaid general conditions.").

This case involves allegations of an episodic act or omission.  To hold a municipality liable in an episodic-act-or-omission case, a plaintiff must establish not only that a municipal employee acted with subjective deliberate indifference but also that the employee's act resulted from a policy or custom adopted or maintained by the municipality with deliberate indifference to the plaintiff's constitutional rights.  *See Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).  This court must examine both the act or omission that allegedly violated the law and the custom or policy that allegedly permitted the act or omission to occur.  In *Hare*, the Fifth Circuit described the proper methodology, as follows:

8

> We separate the two issues: the existence of a constitutional
> violation simpliciter and a municipality's liability for that violation.
> Different versions of the deliberate indifference test govern the two
> inquiries. Our opinion in this case makes clear that to prove an
> underlying constitutional violation in an individual or episodic acts
> case, a pre-trial detainee must establish that an official acted with
> subjective deliberate indifference. Once the detainee has met this
> burden, she has proved a violation of her rights under the Due
> Process Clause. To succeed in holding a municipality accountable
> for that due process violation, however, the detainee must show that
> the municipal employee's act resulted from a municipal policy or
> custom adopted or maintained with objective deliberate indifference
> to the detainee's constitutional rights. *See Farmer [v. Brennan*, 511
> U.S. 825, 841, 114 S. Ct. 1970, 1981, 128 L.Ed.2d 811 (1994)] ("It
> would be hard to describe the *Canton [v. Harris*, 489 U.S. 378, 109
> S. Ct. 1197, 103 L.Ed.2d 412 (1989)] understanding of deliberate
> indifference, permitting liability to be premised on obviousness or
> constructive notice, as anything but objective.").

74 F.3d at 649 n.4.

Based on *Hare,* the court will address whether Nazerzadeh has made the necessary showings

of a constitutional violation and of Harris County's liability for that violation.

### B.      A Constitutional Violation

To state a claim for unconstitutionally excessive force, a plaintiff must allege: (1) an injury;

which (2) resulted directly and only from the use of force that was clearly excessive to the need; and

the excessiveness of which was (3) objectively unreasonable. *Goodson v. City of Corpus Christi*,

202 F.3d 730, 735 (5th Cir. 2000); *Ikerd v. Blair,* 101 F.3d 430, 433 (5th Cir. 1996). "[W]henever

prison officials stand accused of using excessive physical force . . . the core judicial inquiry is . . .

whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). The factors relevant to

an excessive force claim are: (1) the extent of the injury suffered; (2) the need for the application

of force; (3) the relationship between the need and the amount of force used; (4) the threat

9

reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response.  A constitutional violation does not occur with every touching or contact. *Id*.  The "Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  *Id.* at 9-10.  The amount of force must be judged in the context in which it is used.  *See id.* at 9 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973)).

In response to Harris County's interrogatories, Nazerzadeh provided the following account:

> While I cannot recite everything at this time I recall:
>
> I was arrested on February 12, 2006 by FBI agents for a criminal charge.  After appearing before the judge, I was taken to Harris County Jail by the US Marshalls [sic] to be held there under federal custody.  When we got there, the Marshall [sic] escorting me sat me down on a bench and told me to wait there.  I was sitting in the area where they process inmates while he went to take care of the paperwork.  At this time regular inmates at state custody were brought in by police and asked to line up against the wall.  One of the officers mistook me for the state prisoners and yelled "Don't you speak English?", came up and grabbed my wrist before I could answer.
>
> I was scared from the violent way he grabbed me and screamed at me, and out of instinct pulled my hand away and stepped back.  The officer then tackled me face first into the concrete floor and concrete bench, after which he and another officer picked me up by my shoulders, while a third officer put on gloves and punched me with all of his force in the left eye.  Then they started twisting my arms backwards while forcing me into a solid brick isolation room and forcing me to face the wall, at this point my face was repeatedly smashed against the brick wall.
>
> I was then thrown to the ground where I was held down and my face was smashed into a puddle of some sort of liquids material I was repeatedly hit and forced to apologize for something I never did.  At this time the marshal came back with a police officer who was yelling

something to the effect of "No! he is federal", meaning that I was a federal inmate and not a state prisoner after which they stopped and started saying words like "oh s@$#!" "we shouldn't have done that!" and so on.  I was told to strip naked, put in the jail uniform, and then taken to medical.

While I was being taken to medical to be X-rayed and since the Marshall [sic] had already left, they started to mistreat me again, they started treating me roughly, yelling things like "You piece of s*$@!", "You made me miss my lunch", etc.  During the beating, I blacked out several times so I don't know how much more and in what other ways I was hit.  As a result my left eye was damaged (I have floaters in my left eye).  I developed stretch marks on my groin area, my left knee was bruised, the area around my left eye was completely black that stayed for almost three weeks, I had blood in my urine along with sever [sic] pain in my kidneys and testicles.

Later on at the time of a court hearing for a bond, when this issue was brought up to my judge's attention, and Judge asked about the video tape, they said that they had lost the tape!

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 2, pp. 5-6).

Harris County submitted affidavits by the officers who were in the HCJ on the date, time, and area alleged.  Mark W. Wachs stated as follows in his affidavit:

2.      I am a licensed Texas Peace Officer, I have previously completed my Basic Peace Officer, Peace Officer, Temporary Jailer and Jailer license requirements.  I currently hold a Master Peace Officer License.  My training has exceeded all of the standards for licensure set out by Texas statutes and by the Texas Commission on Law Enforcement Officer Standards and Education.

3.      I have worked for the Harris County Sheriff's Office ("Sheriff's Office") since 1985 in the area of detentions.  In 1993 I was promoted to Sergeant and have worked at the Harris County Inmate Processing Center ("IPC") since that time.

4.      I currently work as the Administrative Sergeant over the IPC during the day shift.  I have personal knowledge of the policies, practices and procedures of the Harris County Sheriff's Office as they pertain to the IPC.

5.     All prisoners who enter the Harris County Jail ("Jail") are processed through the IPC.  It is an operation that is open every day at all hours.  Statistics show that from January 1, 2005 thru June 30, 2009 there was an average of 11,221 inmates per month and approximately 134,656 prisoners each year processed into the Jail. In the IPC a prisoner is identified, searched, booked, changed into a jail uniform, taken through medical screening, and evaluated by classification personnel to determine what area of the jail is appropriate for housing that particular prisoner.  It is not unusual for some prisoners to get into altercations with other inmates or with staff, apparently because they have not been in the jail for long and have not settled into the routine, or because they are inebriated or high on alcohol or drugs.

. . .

7.     I understand that inmate Nima Nazerzadeh, SPN 01920584, has filed suit against Harris County alleging that excessive force was used against him on Feburary [sic] 13, 2006 in the IPC.  In my capacity as a supervisor, I often review records of the Harris County Sheriff's Office which pertain to inmates of the Harris County Jail. Such records include those reflecting the inmate's booking and release records, classification records, records reflecting medical care received, incident reports, and grievance records.  I have reviewed the Sheriff's Office jail records of Mr. Nazerzadeh, for the period from February 13, 2006, when he was brought in by a Federal Marshal until May 1, 2006, when he left the jail with a Federal Marshal.

8.     I have reviewed the attached Harris County Sheriff's Office's video of the receiving/search area of the IPC and a hallway leading to separation cells in the IPC which was made on February 13, 2006. *See Video marked Exhibit A attached.*  The original of the video, a true and correct copy of which accompanies this affidavit, is kept by the Harris County Sheriff's Office in the regular course of business. It was the regular course of business of the Harris County Sheriff's Office for an employee or employees of the Office, with knowledge of the act or event, to make the video records.  Such records were made at or near the time or reasonably soon thereafter.

9.     I understand from reading Mr. Nazerzadeh's story in his answers to interrogatories that he claims that in the receiving/search area of the IPC he did nothing wrong but was tackled by an officer and pushed to the floor, then picked up by two officers and was punched in the face by a third officer.  He says that he was then

12

moved to an isolation cell and was smashed against the wall and on the floor and assaulted.

10.    When Mr. Nazerzadeh's lawsuit was first filed two years after the incident no video of the IPC for that period was found.  Some months later I understand that the IT personnel of the Sheriff's Office were able to locate and produce video of the incident.  I have reviewed the video of the incident and I saw no excessive force used by any jail personnel in response to the inmate's attack on the Detention Officer.

11.    From my review of the video it is clear that Detention Officers Michael Medina, Charles Granger, Joseph Cromier [sic] as well as Sgt. Noel Araguz were involved with Mr. Nazerzadeh at some points in his processing at the IPC.  All of these individuals met all state and Sheriff's Office training and licensing requirments [sic] at the time of the incident.

                                    . . .

17.    From my review of jail records generally it does not appear that Nazerzadeh ever followed the Inmate Handbook procedures and filed a grievance or complaint alleging that he was assaulted or that excessive force was used on him in 2006.

18.    Otherwise the jail records show that Nazerzadeh was processed through the normal sequence of processing after he was booked, including being interviewed by a nurse in the IPC to check for any medical problem that he might have and then being interviewed by classification personnel to decide where to assign him in the jail.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 6, pp. 1-2).

Michael Medina testified as follows in his affidavit:

2.    I have been employed by the Harris County Sheriff's Office ("Sheriff's Office") since 2003.

. . . I am currently employed by the Sheriff's Office as a Deputy Sheriff working in the Patrol Division. . . .

3.    I was informed in February 2009 that an inmate named Nima Nazerzaedeh had filed a lawsuit against Harris County claiming that excessive force was used on him while he was being processed into

                                    13

the Inmate Processing Center ("IPC") of the Harris County Jail on February 13, 2006.  On February 13, 2006, I was carrying out my duties as a Detention Officer in the IPC.

4.      I have reviewed (1) Plaintiff's Original Complaint in this lawsuit, (2) Plaintiff's Responses to Defendant's Interrogatories and Request for Production and (3) the video of Mr. Nazerzadeh in the IPC reception area and in the hallway taken on February 13, 2006.

5.      On the video I observed the routine activity of processing inmates into the jail.  At 6:45:54 pm Mr. Nazerzadeh first appears on the video wearing a two-tone blue t-shirt and is brought to sit on the third bench in the receiving area.  At 6:51 pm he is moved to the front bench and is seen by a nurse when he appears to be ill.

6.      At 7:01:08 pm he is sitting on the front bench (which is usually used for female prisoners) when I approach his right side and touched him just under the right arm/shoulder area to assist him to his feet to move him to a back bench.  He and I took four or five steps in a calm and unhurried manner and at 7:01:15 pm Mr. Nazerzadeh began to swing both of his arms and I believed that he was trying to strike or punch me in the face but I think he only hit me on the arm.  I immediately pushed him on his chest to create distance between us so I would not be hit by his swinging fists.  On the video at 7:01:18 pm he falls to a seated position on the concrete bench and then is pushed backward to the floor by me and other officers who came to my aid.  Mr. Nazerzadeh is kept on the floor to limit his ability to strike the officers and he is handcuffed.  At 7:01:46 pm he is escorted out of the reception area and down the hall to a separation cell to allow him to calm down.  Mr. Nazerzadeh was left in the separation cell and I did not personally deal with him again.

7.      The video shows that at about 7:24 pm Mr. Nazerzadeh was taken out of the separation cell and escorted back to the receiving area by Sgt. Araguz and Deputy Dean where he was fingerprinted and photographed.  The prisoner was then returned to the separation cell at about 7:28 pm.

8.      Before leaving my shift I spoke to my supervisor, Sergeant Noel Araguz and together we viewed the video of the incident in the receiving area.  Sgt. Araguz said that no use of force report needed to be filed because of the fact that there was no striking or hitting by any officer and there was no apparent injury from the incident.

14

9.      During the incident and from my review of the video I saw no officer hit, strike or kick Mr. Nazerzadeh at any time and never saw any injury on the inmate.

10.     From my review of the Plaintiff's Responses to Defendant's Interrogatories and Request for Production, I am aware the Mr. Nazerzadeh claims that he was assaulted in the receiving area. I have seen that in his sworn response to Interrogatory No. 3, on page 6, lines 3-6 he swears that "The officer then tackled me face first into the concrete floor and concrete bench, after which he and another officer picked me up by my shoulders, while a third officer put on gloves and punched me with all of his force in the left eye." [sic] I did not see an officer punch Nazerzadeh on the day of the incident and did not see it on the video.

11.     Also from his answer to Interrogatory No. 3, page 6, lines 6-11 I saw that he said that "then they started twisting my arms backwards while forcing me into a solid brick isolation room and forcing me to face the wall, at this point my face was repeatedly smashed against the brick wall. I was then thrown to the ground where I was held down and my face was smashed into a puddle of some sort of liquids material. I was repeatedly hit and forced to apologize for something I never did." [sic] I participated in escorting Nazerzadeh from the receiving area to the separation cell but I did not see any of the alleged events of him being "smashed" into the wall or floor, hit or otherwise struck or assaulted. I had no interactions with Mr. Nazerzadeh other than pushing him away when he started swinging at me, then securing him on the floor to control his aggressive actions and then escorting him to the separation cell. I never used any excessive force on him and I saw no one else use any excessive force on him.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 3, pp. 1-3).

Noel Araguz testified as follows:

2.      I have been employed by the Harris County Sheriff's Office ("Sheriff's Office") since 1997[.]

. . .

3.      I was informed in February 2009 that an inmate named Nima Nazerzadeh had filed a lawsuit against Harris County claiming that excessive force was used on him while he was being processed into the Inmate Processing Center ("IPC") of the Harris County Jail on

15

February 13, 2006.  On that date, I was carrying out my duties as a Shift Sergeant on the second shift (2 pm to 10 pm) in the IPC.

4.      From the Nazerzadeh lawsuit, I have reviewed (1) Plaintiff's Original Complaint, and (2) the video of Mr, Nazerzadeh in the IPC reception area and hallway taken on February 13, 2006.

5.      During the shift while I was working in the Sergeant's Office I heard keys rattling in the hallway not far from my office near the area of the separation cells.  I went to check on what was happening and [sic] found that jailers had brought a detainee, whom I later learned was Mr Nazerzadeh, to the separation cell after an incident in the receiving area.  I told the officers to step back so that I could see what had happened.  I entered the separation cell and talked to the inmate but he didn't seem to want to talk.  I asked the inmate if he was injured in any way and he shook his head "no".  I did not see any injury on Mr. Nazerzadeh.

6.      After a period of time for Mr. Nazerzadeh to be alone and to calm himself in the seperation [sic] cell I went to the cell and with another officer escorted the inmate to the receiving area to complete the process of having his fingerprints completed and his photograph taken.   When this was completed we escorted him back to the separation cell.  At no time did I have any disturbance from the inmate.

7.      Before the end of the shift, Detention Officer Michael Medina and I together viewed the video of the incident.  On the video I saw Officer Medina calmly escorting Mr. Nazerzadeh in the receiving area when the inmate abruptly started swinging his arms toward Medina and Medina immediately pushed the inmate away and to the ground to keep from being hit.  I saw other personnel immediately come to Medina's aid to restrain Nazerzadeh and then to escort him [sic] a separation cell.  I saw no officer hit, strike or kick Mr. Nazerzadeh.

8.      Medina and I discussed the incident and I did not see any need to complete a Use of Force report since there appeared to be no injuries and since I saw nothing done wrong by any jail personnel in restoring order in the jail.  I did not tell Medina to complete a report.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 4, pp. 1-2).

Jay O. Coons testified as follows:

16

2.      I am presently employed as the Commander of the 701 San Jacinto Jail for the Harris County Sheriff's Office.

. . .

8.      From my review of the records it is clear that Nima Nazerzadeh had been arrested and delivered to the custody of the Sheriff's Office by a Federal Marshall[sic].  At the time the prisoner arrived at the IPC he was already in custody and was delivered as a pretrial detainee.

9.      From my review of the videos I observed the overall tone of the receiving area of the IPC to be routine activity and low-key in nature.  At 1901:07 hrs a detention officer is seen calmly stepping to Mr. Nazerzadeh's right side, touching him just under the right arm/shoulder area and assisting Mr. Nazerzadeh to his feet.  At 1901:12 hrs both Mr. Nazerzadeh and the detention officer take approximately four to six steps to the west, again, in a calm and unhurried manner.  At 1901:13 the detention officer slowly reaches across Mr. Nazerzadeh's chest with his right hand and attempts to turn Mr. Nazerzadeh toward him by grasping his left upper arm.

10.      At 1901:15 hrs Mr. Nazerzadeh executes an outside sweep of the detention officer's right hand away from his [Mr. Nazerzadeh's] left upper arm then follows immediately with a roundhouse strike with his right fist toward the detention officer's left facial area which appears on this camera angle to miss.   The detention officer immediately uses a two-hand push to Mr. Nazerzadeh's upper chest to create distance between the two.  Mr. Nazerzadeh first falls to a seated position on the concrete bench and then is pushed backward to the floor by the detention officer.  The detention officer along with other officers secured Mr. Nazerzadeh to the floor to limit his ability to strike them then handcuffed him and lead him out of the reception area at 1901:50 hrs.

11.      The force used by the detention officer was first a push to get distance between him and Mr. Nazerzadeh, then a second push to get Mr. Nazerzadeh to the ground and finally controlling force by all responding HCSO employees to both limit Mr. Nazerzadeh's ability to strike them and to bring him under control.  Once Mr. Nazerzadeh was brought under control, the use of force ceased, save and except for guiding and controlling force in getting Mr. Nazerzadeh back to a standing position and escorting him away from the reception area.

12.      My opinions are based on (1) my review of the video of the incident on February 13, 2006, involving Mr. Nazerzadeh and various

17

jail personnel, (2) my knowledge of the policies and procedures of the Sheriff's Office relating to the care, custody and control of prisoners and (3) my training and experience in law enforcement.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 7, pp. 1-2).

Lois Wiltz testified as follows:

2.      I am currently employed by the Harris County Sheriff's Office as a Licensed Vocational Nurse working in the Medical Division. I have worked for the Sheriff's Office in the Harris County Jail since 1999. In my job, I often review records of the Sheriff's Office which pertain to the medical condition of Jail inmates.

3.      I am a licensed vocational nurse in the State of Texas. In addition to my nurse training, I have been specifically trained in my job to screen prisoners coming into the Inmate Processing Center ("IPC") of the Jail to assess their medical condition at that time.

4.      I understand that Nima Nazerzadeh (SPN 01920584), has filed a lawsuit claiming that he was injured when excessive force was used against him in the Jail on February 13, 2006.

5.      I am personally familiar with the facts in the lawsuit concerning Mr. Nazerzadeh's claim of injury based on my review of the medical record (Health Questionnaire) which I completed and also based on my review of the video of me with Mr. Nazerzadeh in the receiving area of the Jail on February 13, 2006.

6.      From my review of the video I see that I first met and talked with Mr. Nazerzadeh in the receiving area of the IPC, where prisoners go when they first arrive at the Jail and where they are searched and fingerprinted. I was called to the receiving area to check on Mr. Nazerzadeh's medical condition. The video time stamp shows that I was with him for approximately two minutes at about 6:51 pm. He appeared to be nauseous.

7.      Each prisoner who is going through the regular inmate processing steps upon arrival at the Jail is brought to the nurse's area for a health screening after being searched and booked into the Jail. In doing the medical screening I visually observe the prisoner for signs of injury or illness and I ask standard questions regarding the prisoner's medical history and condition and I record my observations and the information provided by the prisoner on the

18

Health Questionnaire form.  The Health Questionnaire is then used to provide the proper medical care to the inmate.

8.      I completed the attached Health Questionnaire, marked HC-NN-13, concerning Mr. Nazerzadeh, showing my findings when I assessed his medical condition in the nurse's area after he had been booked into the Jail.   The Health Questionnaire shows that I performed the health screening at approximately 7:45 pm on February 13, 2006.

9.      On the Health Questionnaire, I recorded that Mr. Nazerazdeh [sic]  was in a wheelchair when I did the intake screening.  I wrote that "Patient in wheelchair complains of numbness to low[er] extremities; noted tremors.  Patient states "he was fine prior to being booked and his knees started shaking; body hurts."  Mr. Nazerazdeh denied the use of drugs or alcohol and otherwise denied any medical problems.  As I was trained and as was my custom, I recorded all the information that I observed and what he told me during the assessment.  I do not remember seeing any medical issues at time when I completed the Questionnaire other than the fact that he was in a wheelchair; he complained of numbness to his lower extremities; he reported that he [sic] knees started shaking while he was being booked; and he reported that his body hurt.  I observed tremors (shaking) during my assessment.  I do not recall seeing any injuries or Mr. Nazerzadeh telling me that he was injured in any way.

10.     If Mr. Nazersadeh [sic] had told me that he had been injured by anyone I would have recorded that information on Health Questionnaire form and would have recorded my observations concerning his areas of claimed injury.  No such report of injuries was made to me.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 5, pp. 1-2).

Dr. Michael Seale testified as follows:

2.      I am currently employed by the Harris County Sheriff's Office as the Executive Director for Health Services, I have worked in a supervisory capacity in the jail environment, specifically the Harris County Jail, since 1994.  In my job, I often review records of the Harris County Sheriff's Office which pertain to medical care received by inmates.

19

3.      I am a licensed medical doctor in the State of Texas.  I am board certified in Family Practice medicine.  My expertise includes knowledge of the duties and appropriate decisionmaking process of physicians and nurses in Harris County, Texas, I am qualified as an expert to provide a[n] assessment of the medical condition and the care delivered to Mr. Nazerzadeh as well as the proper record keeping of the patient based on my training and experience in family practice and correctional medicine.  I am a non-retained expert and am not being paid for providing testimony in this case.

4.      I have reviewed Harris County Sheriff's Office medical records of Nima Nazerzadeh, SPN 01920584, for the period from February 13, 2006, to May 9, 2006.  A summary of the medical record entries outlining the medical care and history of Nazerzadeh while he was in Harris County Jail custody is as follows:

2/13/06 1945 hours.   Intake Screening: "Patient in wheelchair complains of numbness to low[er] extremities; noted tremors.  Patient states 'he was fine prior to being booked and his knees started shaking; body hurts.'  Denies drugs/alcohol use."

2/13/06 2010 hours.  Nursing note: "Patient states he has anxiety, obsessive-compulsive disorder.  Patient takes psych meds.  Noted slight amount of swelling to right temple."

2/13/06 Physician note:  "22 year old male who felt as if he was going to throw up and was having muscle spasms, including his knees.  Unable to walk due to muscle spasms.  States he gets very shaky when he tried to walk.  Takes Adderall, Wellbutrin and Klonopin, at least 5 mg daily.  Denies daily alcohol.  Denies illegal drugs. Denies HIV or hepatitis C."  "No apparent distress.  Head, eyes, ears, nose, throat: unremarkable. Neck: supple." Assessment: anxiety/ benzodiazepine addiction.

2/13/06 Physician admission note to the medical infirmary:  "history of taking 5 mg Klonopin daily and having tremors.  Also taking Adderall, Wellbutrin daily.  Denies daily alcohol or illegal drugs." Diagnosis: anxiety, Klonopin addiction.   Admitted to the jail's medical infirmary and referred to MHMRA.

2/14/06 Physician infirmary discharge note:  "Unremarkable exam. No laceration to face, head, oropharynx clear and without evidence of recent trauma."

20

2/14/06 MHMRA evaluation. "Client appropriate for general population."

2/15/06 1730 hours. Nursing note: "Complains of problems urinating."

2/15/06 Physician note: "Complains of inability to urinate and abdominal pain. History of obsessive/compulsive disorder, denies alcohol/drugs, smokes." "Positive ecchymosis over right eye area. Head, eyes, ears, nose, throat otherwise OK." Assessment: "Abdominal pain, etiology?" Increased fluids, Bentyl, follow-up appointment ordered.

2/17/06 0630 hours. Nursing note: "Called to court holdover, inmate complains of chest pains, dizzy, seeing spots in left eye, feels like 'he's drowning.' Physician to medically clear for court this morning."

2/17/06 Physician note: "patient with history of anxiety disorder on detox protocol (Librium taper) for benzodiazepine abuse. Patient has no history of cardiac or pulmonary disease. Well developed/well nourished in no apparent distress. Oxygen saturation 99% on room air. Patient exhibiting deliberate 'tremor.'" Assessment/Plan: "anxiety attack/mild costochondritis. No Librium ordered for taper for today. Dicyclomine 20 mg by mouth now."

2/17/06 1600 hours. Nursing note: "Complains of panic attack, unable to be still, wants his meds to be reviewed."

2/17/06 Physician note: "History of bipolar disorder, panic attacks. Previously on multiple medications. Has not had meds since incarceration. Patient [?] on Librium. States he is agitated and unable to sit still. Afraid he will hurt himself. No suicidal ideation/homicidal ideation. No hallucinations." "Anxious, rapid/ pressured speech. Good insight and judgment." Assessment/Plan: "panic attacks—refer to Psych for evaluation."

2/17/06 Psychiatrist evaluation: "History of attention deficit disorder, depression, anxiety (possible obsessive-compulsive disorder), seen for evaluation of persistent anxiety with multiple visits to the medical clinic for somatic complaints vague in nature that suggest high level of anxiety. Patient is tearful, overwhelmed, mildly tachypneic. Hasn't been on usual psych meds since incarceration. Complains of low mood, fearfulness, constant and

unrelenting obsessive ruminations.  Denies any intention to harm himself in any way, although he has had vague suicidal ideation.  No homicidal ideation. No history of suicide attempts or gestures. Patient denies actual desire for death.  Rather, he is overwhelmed by his obsessive ruminations and recurring panic symptoms and literally begs for relief.  No delusions.  No symptoms of mania. Judgment not impaired.  No auditory/visual/tactile hallucinations."

2/17/06 1915 hours.   Psychiatrist orders for Lexapro, Klonopin, Trazadone and Ativan.

2/17/06 1920 hours.  Psychiatrist note:  "Ativan 1 mg IM now."

2/17/06 Patient admitted to the jail's mental health unit.

2/17/06 2100 hours.  MHMRA—admit note.  "Has a bruised right eye that he says he received from falling down.  He is alert, oriented times three and denies suicidal ideation, homicidal ideation, auditory or visual hallucinations.  States that his court appearance today did not go as he anticipated and he became nervous, somewhat short of breath and could not stay on his cell cot (too restless and anxious)."

2/18/06 Psychiatrist orders for Haldol and Benadryl for increased anxiety.

2/19/06 Psychiatrist orders for Cogentin IM "for possible extrapyramidal symptoms."

2/20/06 Psychiatrist note:  "Has number of somatic complaints." Discontinued Lexapro.  Ordered Norpramin.

2/22/06 Nursing note:  ["]Physician appointment - complains of sore throat."

2/22/06 Physician note:  "Patient complains of sore throat for three days.  Positive dysphagia.  Positive productive cough.  Positive headache—frontal. Positive congestion."  Assessment/Plan: "Strep throat."  Antibiotic and decongestant prescribed.

2/24/06 14-Day Health Assessment:  Question:  "Head Injury" marked "no." "No complaints today." Skin examination documented as  "normal."

22

2/25/06 2030 hours.  Nursing note:  "Complains of pain left ear, 'popping' sound bilateral ears."

2/25/06 Physician note:  "Patient here secondary to 'nurses told him his infection (sore throat) is resistant to the antibiotics—patient says actually feeling 'better'—voice clearing—still with ear 'popping' sounds.  No fever, chill.  Loose cough.  Also questionable history of diabetes mellitus—says blood glucose was 240 in MHMRA nursing station yesterday."  Impression: "Pharyngitis—resolving.  Cough.  Questionable hyperglycemia (per patient statement)."  Antibiotic continued.  Robitussin prescribed.  Fingerstick blood glucose testing ordered.

2/27/06 Psychiatrist note:  "Patient doing well enough to warrant transfer to general population today."  Medications ordered for 90 days.

2/28/06 Antibiotic and Robitussin orders by physician.

3/1/06 Physician note:  "AM fingerstick glucoses average 94; PM average 95."

3/14/06 Nursing assessment for complaint of back pain.  "Patient complains of lower back pain and right upper extremity.  States has been trying Motrin and no relief.  Denies trauma.  Instructions given to patient.  Pending physician evaluation."  Appointment made for 3/20/06.

3/20/06 0635 hours.  Nursing note:  "Physician appointment, triage complains of fluid in both ears, pain radiating up to right testicle."

3/20/06 Physician note:  "Patient is complaining of pain in right testicle, the next day he had pain in medial aspect of knee.  The next day, he then had radiating pain starting from knee up his medial thigh to his groin.  He states that when he walks he gets pinching pain.  All these started four weeks ago.  He has never had anything like this happen before.  Patient also complains of fluid in both ears, left ear worse.  Patient states he had wisdom teeth pulled out approximately two months ago but since then has noticed increasing ear infections."  Abdomen: "reducible right inguinal hernia."  Assessment/Plan: "Patient is a 23 year-old male presenting to clinic with a four week history of pain in groin area sometimes radiating to knee.  Inguinal hernia."  Patient referred to General Surgery.

23

3/31/06 General Surgery note: "Patient with bilateral inguinal hernia. Plan: repair LBJ."

4/25/06 MHMRA caseworker note: "Caseworker met with consumer for medication non-compliance.  Consumer reports he has not been compliant with medications because he feels medications are not right medications for him and says he felt very sleepy and dizzy and 'artificially gave me a happy sensation.'  Consumer reports he began to 'think more clearly' after he stopped taking medications. Consumer estimates he has not taken any medications for approximately one month.  Consumer reports anxiety since he stopped medication but reports 'it's not really that bad.'  Consumer is requesting medications be discontinued."

4/27/06 Psychiatrist note: "Discontinue Klonopin, discontinue Trazadone, discontinue Norpramin.  Consumer refuses for last month."

5/9/06 Scheduled appointment at LBJ Hospital General Surgery clinic.

5.     In summary, the medical records show that Mr. Naserzadeh did not make any outcry or report to any medical personnel of an alleged assault or use of excessive force during the booking process despite having many opportunities to do so with many different medical personnel.  In fact, the one sign of trauma was bruising (ecchymosis) around the right eye which was noted in the records on 2/15/06.  Mr. Naserzadeh himself reported on 2/17/06 that the bruised eye had occurred as a result of his falling down.

6.     In my opinion, based on my training and experience, the medical records indicate no report or outcry by Mr. Nazerzadeh of a use of excessive force or assault by any employee of the Harris County Sheriff's Office.

7.     In my opinion, the medical records indicate that the only sign of any trauma was some bruising around the right eye which was described by Mr. Naserzadeh as having been the result of his falling down.

8.     In my opinion, the medical records do not support Mr. Naserzadeh's claims of injury caused by assault or excessive force.

9.     All my opinions expressed in this affidavit are based on my training and experience as a licensed physician and specialist in correctional medicine.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 8, pp. 1-5).

Nazerzadeh argues that his booking photo and clinic records show a puffy "split lip" not caused by anything shown on the video.  (Docket Entry No. 35, Plaintiff's Response, p. 8).  He claims that the lip injury must have occurred off-camera.  The summary judgment evidence does not support this argument.  The video and medical records show that Nazerzadeh had some bruising around his right eye after the February 12, 2006 incident.  Dr. Seale testified that the only sign of trauma reflected in the notes of the nurse and doctors who examined Nazerzadeh on February 13 was some swelling around the right temple.

A prison inmate alleging excessive force must show that the force used was malicious and sadistic, for the very purpose of causing harm rather than in a good-faith effort to maintain discipline.  *Hudson v. McMillian,* 503 U.S. 1 (1992).  The Eighth Amendment prohibition against cruel and unusual punishment excludes *de minimis* uses of physical force, provided that the force is not of a sort "repugnant to the conscience of mankind."  *Hudson,* 112 S. Ct. at 999.  *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033 (1973) (cited with approval in *Hudson,* 112 S. Ct. at 1000).  Although an injury must be more than *de minimis,* it need not be significant.  *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir. 1997) (citing *Hudson*).

In *Siglar v. Hightower,* the Fifth Circuit considered whether an inmate's injury, alleged to have resulted from excessive force, was too minor to raise a constitutional issue.  The court described the officer's conduct and injury, as follows: "[the corrections officer] twisted Siglar's arm

behind his back and twisted Siglar's ear.  Siglar's ear was bruised and sore for three days but he did

not seek or receive medical treatment for any physical injury resulting from the incident.  There is

no allegation that he sustained long term damage to his ear."  *Id*. at 193.  The court concluded that

because "Siglar's alleged injury – a sore, bruised ear lasting for three days – was *de minimis*," he

had not raised a valid claim for excessive force.  *Id*.

By contrast, in *Gomez v. Chandler*, 163 F.3d 921 (5th Cir. 1999), the court found a fact issue

as to whether the force applied was excessive.  The court observed that the force used against Siglar

was far briefer and less intense and less calculated to produce real physical harm than that applied

to Gomez.  Guards allegedly knocked Gomez down so that his head struck the concrete floor,

scraped his face against the floor, repeatedly punched him in the face, and kicked him in the face

and head.  Gomez allegedly suffered "cuts, scrapes, contusions to the face, head, and body."  On this

record, the Fifth Circuit concluded that it could not say as a matter of law that Gomez's injuries were

no more than *de minimis.  Id*. at 924-25.

In this case, Nazerzadeh's lip and eye injuries are similar to those alleged in *Siglar*, which

were minor and temporary in nature.  *Siglar v. Hightower,* 112 F.3d 191 (5th Cir. 1997).  And the

force used against Nazerzadeh was briefer, less intense, and less calculated to produce physical harm

than that applied to Gomez.  The Supreme Court, however, has recently emphasized that the core

judicial inquiry when a prisoner alleges excessive force is not whether a certain amount of injury

resulted, but rather whether force was applied in a good-faith effort to maintain discipline or

maliciously and sadistically for the very purpose of causing harm.  *Wilkins v. Gaddy,* --- U.S. ---,

130 S. Ct. 1175 (2010).  The extent of injury is relevant to determining the amount of force applied

and its purpose.  The prisoner in *Wilkins* suffered multiple injuries, including a bruised heel, lower

back pain, migraine headaches, dizziness, depression, panic attacks, and nightmares.  He received

X-rays and was prescribed medications.  In discussing the approaches taken by different circuits,

the Supreme Court observed that these injuries would not be considered *de minimis*.  Rather than

focusing on the amount of injury, the important question is whether the force was applied in a good-

faith effort to maintain discipline or maliciously and sadistically, for the very purpose of causing

harm.

The second *Hudson* factor analyzes the need for using force.  The DVD that is part of the

summary judgment evidence shows Nazerzadeh being processed into the jail.  At 6:45:54 p.m.,

Nazerzadeh first appears on the video wearing a two-tone blue t-shirt.  He is brought to sit on the

third bench in the receiving area.  At 6:51 p.m., he is moved to the front bench and is seen by a nurse

when he appears to be ill.  At 7:01:08 p.m. he is sitting on the front bench (which is usually used for

female prisoners).  Deputy Medina approaches Nazerzadeh's right side and touches him just under

the right arm/shoulder area, apparently to assist him to his feet to move to a back bench.  Nazerzadeh

and Deputy Medina took four or five steps.  At 7:01:15 p.m., Nazerzadeh begins to swing his arms

and fists.  Deputy Medina pushes Nazerzadeh in the chest, to separate himself and Nazerzadeh, to

avoid being hit by Nazerzadeh's swinging fists.  At 7:01:18 p.m., Nazerzadeh falls to a seated

position on the concrete bench.  Deputies Medina, Cormier, and Granger push Nazerzadeh backward

to the floor and handcuff him, preventing him from swinging his arms and fists.  At 7:01:46 p.m.,

Nazerzadeh is escorted out of the reception area and down the hall to a separation cell.  At about

7:24 p.m., Sergeant Araguz and Deputy Dean remove Nazerzadeh from the separation cell and

escort him back to the receiving area, where he is fingerprinted and photographed.  At about 7:28

p.m., Nazerzadeh is returned to the separation cell.  This evidence shows that there was a reasonable

27

basis for the jailers to use some force to subdue Nazerzadeh.  The second *Hudson* factor weighs in favor of the defendants.

The third *Hudson* factor is the relationship between the need and the amount of force used. The summary judgment evidence shows that Nazerzadeh began swinging his arms and fists in the IPC, with Deputy Medina standing next to him.  Deputy Medina responded with an open-hand push to Nazerzadeh's upper chest to create distance between them.  Nazerzadeh fell to a seated position on the concrete bench and was then pushed backward to the floor by the detention officer.  Deputies Medina, Cormier, and Granger secured Nazerzadeh on the floor and handcuffed him so he could not strike an officer, then led him out of the reception area.  The application of force shown on the DVD was not clearly excessive to the need.  *Hudson,* 503 U.S. at 6-7.  The third *Hudson* factor weighs in favor of the defendants.

The fourth *Hudson* factor concerns the threat reasonably perceived by the responsible officials.  The evidence shows that the jailers reasonably perceived that Nazerzadeh was trying to strike an officer.  The fourth *Hudson* factor weighs in favor of the defendants.

The fifth *Hudson* factor concerns the efforts to temper the severity of a forceful response. The summary judgment evidence shows that the defendants used a minimal amount of force. Deputy Medina used an open-hand control technique to push Nazerzadeh, and he was pushed first to a seated position, then to the floor.  The fifth *Hudson* factor weighs in favor of the defendants.

In summary, the recording shows that the jailers used force to subdue Nazerzadeh after he swung his arms and fists, trying to punch Deputy Medina.  The evidence in the record shows that the jailers used force in a good-faith effort to maintain discipline, not maliciously and sadistically

for the very purpose of causing harm.  Nazerzadeh has not raised a fact issue as to whether the use of force was done with subjective deliberate indifference to his constitutional rights.  *Id.*

### C.    Municipal Liability for the Constitutional Violation

Even assuming that Nazerzadeh had met this burden of establishing a constitutional violation, the next issue is whether Harris County may be liable for the constitutional violation alleged.  A municipality may not be held liable under § 1983 on a theory of *respondeat superior*, *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978), but instead only for acts that are directly attributable to it "through some official action or imprimatur."  *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001).  To hold a municipality liable under § 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the municipality's policymaker was the moving force behind, or actual cause of, the constitutional injury.  *Id.*   The official policy itself must be unconstitutional or adopted "with deliberate indifference to the known or obvious fact that such constitutional violations would result." *Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 309 (5th Cir. 2004); *see also Piotrowski,* 237 F.3d at 579.

Official policy usually exists in the form of written statements, ordinances, or regulations, but it may also take the form of a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy."  *Piotrowski,* 237 F.3d at 579 (quoting *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).  A policy or custom is official only "when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989).  Under Texas law, a sheriff is a county's "final policymaker"

in the area of law enforcement. *Williams v. Kaufman Cnty.,* 352 F.3d 994, 1013 (5th Cir. 2003). A policy must be the moving force behind the constitutional violation. *Piotrowski,* 237 F.3d at 580 ("In addition to culpability, there must be a direct causal link between the municipal policy and the constitutional deprivation.") (citing *Monell,* 436 U.S. at 694). A plaintiff must show "a direct causal link" between the policy and the violation. *Id.; see also Johnson,* 379 F.3d at 310 (quoting *Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir. 1992) ("must be more than a mere 'but for'")). And the courts have stressed that the moving force and deliberate indifference elements of municipal liability, "must not be diluted, for '[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.'" *Snyder v. Trepagnier,* 142 F.3d 791, 796 (5th Cir. 1998) (quoting *Bd. of County Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397 (1997)).

A plaintiff must also show that, if an official policy is not facially unconstitutional, it was adopted "with 'deliberate indifference' as to its known or obvious consequences.'" *Johnson,* 379 F.3d at 309; *see also Piotrowski,* 237 F.3d at 579. Deliberate indifference is beyond negligence or even gross negligence; it "must amount to an intentional choice, not merely an unintentionally negligent oversight." *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir. 1992); *see also Conner v. Travis Cnty.,* 209 F.3d 794, 796 (5th Cir. 2000).

Nazerzadeh has failed to raise a fact issue as to whether he was subjected to an unconstitutionally excessive use of force. Even assuming that Nazerzadeh had done so, Nazerzadeh must show that an official policy or custom promulgated or approved by the relevant policymaker was the moving force behind, or actual cause of, the constitutional injury. The summary judgment

record includes the Harris County Sheriff's Department use of force policy, which states in relevant

part, as follows:

> 7.      Legal Limitations:  Deputies may use force and/or deadly force only under certain lawful or authorized situations.  Penal Code Sections 9.51 and 9.52 delineate the Texas law of justifiable homicide.  The law specifies that a Deputy must not use deadly force except in certain lawful or authorized situations.  No Deputy has the right to extend this power, but must decide his/her action in light of the circumstances confronting him/her within the limitations of his/her authority.

> 8.      Misdemeanants: A Deputy may not use deadly force to effect the arrest or prevent the escape of a person who has committed a misdemeanor.  This restriction does not infringe upon a Deputy's right of self-defense should he/she be attacked.

> 9.      Protection of General Public:  Regardless of the nature of the crime or the legal justification for using deadly force against a suspect, Deputies should remember that their basic responsibility is to protect the public.  Deputies should be particularly cautious when using deadly force under conditions that would subject bystanders to possible injury or death.

> 10.     Reasonable Belief.  A belief that would be held by an ordinary and prudent person in the same circumstances as acting person.

> 11.     Reasonable Force:  Use of the minimum amount of force needed to achieve control over an incident or person.

> 12.     Self Defense: A Deputy is entitled to use deadly force when it is necessary to save himself/herself, a citizen, another Law Enforcement Officer, or a prisoner from death or serious harm. He/she is not permitted to use deadly force to protect himself/herself from assaults which are not likely to have serious results.
>                                         . . .
> B.      A Deputy is justified in using force against another when and to the degree the Deputy reasonably believes the force is immediately necessary to accomplish lawful objectives, and if:

> 1.      The Deputy reasonably believes the arrest or search is lawful, and or;

2.      The arrest or search is made under warrant and the Deputy reasonably believes the warrant is valid;

and

3.      Before using force, the Deputy states the purpose of arrest or search and identifies himself as a Deputy unless he/she reasonably believes the purpose and identity are already known by the person to be arrested.

C.      Deadly Force

Use of Deadly force must be in accordance with all applicable State and Federal laws.  A Deputy is justified in using deadly force against another when and to the degree the Deputy reasonably believes the action is in defense of human life, including the Deputy's own life, or in defense of any person in imminent danger of serious physical injury.

. . .

E.      Reporting Use of Force

1.      The Sheriff's Office will carefully examine all incidents wherein its personnel have applied force as defined in Section 2 (below) to ensure that each event is properly documented and investigated for the following reasons:

a.      To assure the community that the policies of the Sherif''s Office are followed.

b.      To ensure proper and accurate documentation of the incident in the event of civil action being brought against the Sheriff's Office or the Deputy.

c.      To evaluate the training needs of the Sheriff's Office. Unauthorized or indiscriminate use of physical force may result in disciplinary action being taken against an employee.

2.      All incidents involving the use of force in the following categories shall be documented in Sheriff's Office reports by the involved employee, reviewed by the immediate supervisor, and forwarded to the respective Division Commander:

. . .

3.      Annual Analysis of Use of Force Reports

32

a.      Each Division Commander shall review all reports generated by employees under his/her command involving Use of Force.

b.      Each Division Commander shall conduct an analysis of these reports to determine any trends, patterns, or tendencies that may indicate a need for training, counseling, or further administrative review.

c.      Each Division Commander shall submit an annual report, not later than March 1 of each year, to their respective Bureau Commander detailing any patterns or trends involving use of force which may require additional training, equipment, or policy modifications.

. . .

G.      Use of Force Training

All Deputies will receive annual in-service training on Use of Force Policies.  A copy of Sheriff's Office approved "Use Of Force Policy" will be issued to each Deputy.

1.      This training will be documented, and records maintained by the Academy.

H.      Levels of force that a Deputy may use to gain control over a subject are divided into the following categories:

1.      Deputy physical presence

2.      Verbal Direction/ commands

3.      Empty hand control

a.      Soft empty hand control

b.      Electronic Incapacitation Devices

c.      Hard empty hand control (strikes)

4.      Intermediate weapons

a.      Soft intermediate weapons

b.      Hard empty hand control (strikes)

33

5.      Lethal force

I.      Levels of Force and Control

1.      A Deputy is authorized to use only the necessary and reasonable amount of force to effect an arrest and deter any aggression or resistance on the part of the subject being arrested. The Deputy's actions will be guided by the offender's level of resistance as identified above.

2.      Once resistance is overcome or aggression is reduced, the Deputy must correspondingly and immediately reduce the degree of force he/she is applying, or the use of force is not legal.  This is commonly referred to as de-escalation.

3.      The Deputy must be able to articulate and document the level of resistance he/she encounters and the reasoning he/she uses for selecting a level of control in response.  These factors may include the ability of the offender to violently resist based on his physical condition, a history of aggressive behavior, or the availability of weapons.  The Deputy's reaction will also be influenced by his/her training, experience, and knowledge of physical control techniques, and his perception of danger to himself/herself and others presented by the subject's resistance.

4.      The Deputy's reaction to resistance will be in one of four categories: verbal direction, empty hand control (soft and hard), intermediate weapons (impact, chemical), or lethal force.

(a)      Verbal Direction

The majority of situations can be resolved by good communication skills or verbal direction. Often, the mere presence of a Deputy and proper verbal direction will be sufficient to persuade most individuals to follow a Deputy's direction.  In any verbal confrontation, fear and anger must be defused before a suspect will be able to understand the Deputy's commands.  This requires good communication skills and patience.  Successful communication techniques can prevent many physical confrontations from escalating to higher levels.

(b)      Empty Hand Control

Empty Hand Control tactics cover a number of subject control methods.  Some of these methods may be as subtle as gently guiding

34

a subject's movements, to more dynamic techniques such as strikes and kicks which may have a higher potential of injury to the subject. This policy divides Empty Hand Control into two categories, soft empty hand control and hard empty hand control.

(1)     Soft Empty Hand Control.

This level of control is designed to control primarily low levels of resistance.  Soft Empty Hand Control techniques have a minimal to nonexistent possibility of injury.  Generally, these techniques are used to control passive or demonstrator types of resistance and defensive resistance.

(2)     Electronic Incapacitation Device

Sheriff's Office approved TASER X26 System is a tool that can provide a means by which a Deputy can defend himself or another from injury and a means of controlling an offender.  Deployment is justified when verbal commands are ignored or soft empty hand control tactics are ineffective.

(3)     Hard Empty Hand Control.

This level of control is for high levels of defensive resistance, active aggression, or aggravated active aggression.  Techniques that fall into this level of force have a probability of soft or connective tissue damage, skin lacerations that require medical attention, or bone fractures.  Although the use of these techniques may create some minimal injury to the offender, a Deputy may be risking injury to himself/herself or may have had to utilize higher levels of control (such as intermediate weapons) if Hard Empty Hand Control had not been used. Striking and Stunning blows are considered Hard Empty Hand Control techniques.

. . .

It is the view of our society as well as the Harris County Sheriff's Office that the value of human life is immeasurable.  Deputies are delegated an awesome responsibility to protect life, property, and apprehend criminal offenders.   The apprehension of criminal offenders and the protection of property must at all times be subservient to the protection of life.  Therefore the Sheriff's Office and the Citizens of Harris County place a heavy responsibility on the Deputy to protect human life, which must include their own.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 6, Ex. B, pp. 1-6).

Sheriff's Deputy Mark W. Wachs testified in his affidavit about the policy, as follows:

6.     Deputies and detention officers working in the IPC are required to provide for the care, custody and control of inmates. On February 13, 2006, the Sheriff's Office only employed licensed peace officers (deputies) and detention officers (jailers) who were licensed by the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) to work with inmates in the Jail. All deputies are licensed peace officers who have completed the state-mandated curriculum required by TCLEOSE and have passed a state licensing exam. All detention officers working as jailers are required to be certified jailers who have passed a state exam after being trained in the proper care, custody, and control of inmates. Additionally, all new deputies and detention officers working in the IPC go through a period of on-the-job training wherein they are directly trained by more experienced deputies. Training of deputies and detention officers is a continuing activity which is accomplished through the formal, mandatory yearly certification training, both in the classroom training and field training required by TCLEOSE and by daily on-the-job experience and training. From my personal knowledge of the policies of the Sheriff's Office and operation of the IPC I can testify that all of the Jail personnel who worked in the IPC on February 13, 2006 were properly trained and licensed in accordance with Texas law and Sheriff's Office policy.

. . .

12.    At the time of the incident in February 2006 the Sheriff's Office and the IPC had written Use of Force policies, a true and correct copy of which is attached hereto. *See UOF Policy marked Exhibit B attached.* Briefly stated, that policy required that all personnel "fully comply with all applicable state and federal laws" (at 1.0); that reasonable force under the policy was the "minimum amount of force needed to achieve control over an incident or person" (at 1.A.11); and reporting of the use of force is required when various specified types or means of force are used (ex: discharge of a firearm) and when force results in an "injury or death" (at 1.E.2.H). If none of the specificed[sic] types of force was used which required a report and if no injury was observed then a written report was not required.

13.    The reporting of a use of force is to be handled by the principal officer involved in the incident in conjunction with his supervisor. A report is not required every time personnel place their hands on an inmate (for example to guide him to a separation cell etc) and no injury is noted. The decision of when to file or not to file a use of force report is left up to the discretion of the principal officer

involved and his supervisor.  While I personally might have had the officer write a report if I had been the supervisor and was aware of the incident, there is some discretion involved in that decision.

14.     All IPC personnel involved in the incident on February 13, 2006 were supervised and monitored in the following ways, among others:  (1) the presence of the personnel on duty was monitored and supervised; (2) the location and work assignment of personnel was monitored; (3) each employee's work performance and conduct was regularly observed by his supervisors; (4) each employee received a performance evaluation by a sergeant usually twice each year; and (5) all grievances or complaints against any staff personnel were investigated and reviewed by a supervisor.

15.     All IPC personnel are subject to discipline when the deputy or detention officer violates a policy, rule, or regulation of the Harris County Sheriff's Office.  Disciplinary procedures are formal procedures, and punishment for a major violation or for repeated minor violations can result in the employee's termination.  When it is determined that an employee has engaged in an incident and has violated policy, such as an excessive use of force, a disciplinary report is generated and set procedures are followed.  The Harris County Sheriff's Office has disciplined deputies and detention officers for excessive use of force and such discipline has also included termination in some instances.

16.     The Harris County Jail, including the IPC, is inspected every year by the Texas Commission on Jail Standards.  That inspection involves a physical inspection of the conditions of the Jail, the number of personnel and inmates and the policies and procedures in place.  Of the time period involving February 13, 2006 the Jail Commission raised no issues with and made no criticism of the policies and procedures of the Jail concerning the use of force.
                                    . . .
19.     All my statements and opinions expressed in this affidavit are based on my training and experience as a certified peace officer and on my personal knowledge as stated herein.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 6, pp. 2-4).

Deputy Michael Medina testified as follows:

2.      I have been employed by the Harris County Sheriff's Office ("Sheriff's Office") since 2003.  I was originally hired, trained and worked as a Detention Officer (jailer) in the Harris County Jail ("Jail").  I was trained at the Jail School and also received on-the-job training concerning my duties as a Detention Officer.  I was trained on the policies and procedures of the Sheriff's Office.  I was trained regarding the proper care, custody and control of inmates in the jail. I was trained that it was my duty to maintain order in the jail.  I was specifically trained that when it was necessary to use force to carry out my duties that I was to use the least amount of force necessary to maintain control and to only use reasonable force.  I passed the state-mandated exam and obtained a Jailer License from the Texas Commission on Law Enforcement Officer Standards and Education. I later took additional training at the Sheriff's Academy to become a licensed peace officer in the State of Texas.  I am currently employed by the Sheriff's Office as a Deputy Sheriff working in the Patrol Division.  By training and experience I am familiar with the policies and procedures of Sheriff's Office and the operation of Harris County Jail.

. . .

12.      I was fully aware in February 2006, the Sheriff's Office had policies and procedures which (1) required jail personnel to follow state and federal laws and (2) prohibited the abuse of authority by employees of the Sheriff's Office, including the use of excessive force.  As I had been trained when I was hired in 2003, the policies prohibited the unreasonable or excessive use of force by an employee on an inmate.

13.      I am aware from my review of the Complaint at item 17 that Nazerzadeh claims that there was "custom, policy, practice and procedure by Harris County allowing al[sic] the aforementioned bad acts of Harris County employees."  From my personal experience I am[sic] do not know of any such custom or policy or practice or procedure of allowing bad acts.  I have on a number of occasions completed a Use of Force report regarding some incident in which I participated as a part of my duties in the Jail.  I am aware that in appropriate circumstances the Internal Affairs Division investigates use of force incidents.  I am also aware the from time to time Sheriff's Office personnel have been disciplined for violation of Sheriff's Office policies.  I have no knowledge of and am unaware of

38

a practice or policy of the Sheriff's Office allowing or condoning the use of excessive force by failing to properly train, supervise, investigate or discipline personnel who violate the written policies.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 3, pp. 1-3).

Officer Noel Araguz testified as follows:

2.      I have been employed by the Harris County Sheriff's Office ("Sheriff's Office") since 1997, I was originally hired, trained and worked as a Detention Officer (jailer) in the Harris County Jail ("Jail"). I was trained at the Jail School and also received on-the-job training. I was trained regarding the proper care, custody and control of inmates in the jail and also the policies and procedures of the Sheriff's Office. I later took additional training, passed the state-mandated training and exam to become a licensed peace officer in the State of Texas and a Deputy Sheriff. After working in the jail I worked in the Patrol Division and was promoted to Sergeant. After my promotion to Sergeant I received additional training on how to carry out my duties as a supervisor. By training and experience I am familiar with the policies and procedures of the Sheriff's Office and the operation of Harris County Jail. As part of my training I knew that the policy of the Sheriff's Office regarding the use of force required that the jail personnel follow the state and federal laws and when it was necessary to use force they were to use the least force necessary to accomplish proper control of the situation.

                                              . . .

9.      From my training in the Sheriff's Office it was my understanding in 2006 that the Use of Force policy required that a report be completed every time there was an injury and any time that blows, strikes or kicks were used but otherwise filing a report was discretionary and was up to the supervising personnel. I saw no need to complete a report on this minor incident based on what I had seen on the video, my conversation with Officer Medina and based on my interaction with Nazerzadeh.

10.      During my work as a supervisor in the IPC, I recall that approximately twenty (20) Use of Force reports that[sic] were completed for incidents involving personnel on my shift. When such a report was completed, it was forwarded by me to the Lieutenant above me for review. As I had been trained years before the incident, the policies of the Sheriff's Office prohibited the unreasonable or excessive use of force by an employee on an inmate. Based on my training and experience, I know of no policy or procedure that was

not properly followed by everyone that I observed concerning this incident.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 4, pp. 1-2).

Commander Jay O. Coons testified as follows:

2.     I am presently employed as the Commander of the 701 San Jacinto Jail for the Harris County Sheriff's Office.  I began my employment with the Sheriff's Office in 1982 as a Deputy Sheriff and was assigned to the jail and Bomb Squad.  Since, I have been promoted through the ranks serving at various times as a sergeant (jail, booking and releasing, bomb squad), lieutenant (patrol watch commander; commander, Harris County Emergency Management; commander, inmate processing center; commander, central records; commander, Grievance and Disciplinary committee) and captain (night commander; executive officer, 701 and 1307 Jails; commander, Emergency Response Team; executive officer, 1200 Jail and Medical Security; commander, Inmate Housing; commander, Administrative Services Division; commander, 701 and 1307 Jails). I have been employed by the Sheriff's Department as a peace officer for approximately twenty-seven (27) years.  I am a licensed Texas Peace Officer and have met all of the standards for licensure set out by statute and by the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE).

3.     I attended Harris County Sheriff's Academy to obtain my basic law enforcement training.  I have over 2,000 hours of advanced TCLEOSE training.  I also hold Basic, Intermediate, Advanced, and Master Peace Officer certification and Instructor certification from the Texas Commission on Law Enforcement Officer Standards and Education.  I am certified as an Emergency Manager by the Texas Department of Public Safety.  I am certified as a Bomb Technician by the Federal Bureau of Investigation.  I hold a Bachelor of Science in Law Enforcement, a Master of Science in Criminal Justice Management and a Doctor of Philosophy in Criminal Justice from Sam Houston State University.  Additionally, I have taught aspects of law enforcement, statistics and research methods as a Doctoral Teaching Fellow at Sam Houston State University and as an Adjunct Professor at the University of Houston/Downtown.

4.     By training and by experience, I am familiar with the laws of the State of Texas, the policies and procedures of Harris County Sheriff's Office and I am qualified as an expert in the field of law

enforcement relative to the duties and appropriate decision making process of jail personnel including detention officers and licensed peace officers in Harris County, Texas. I am a non-retained expert in this case.

5.      I aware inmate Nima Nazerzadeh, SPN 01920584, has filed suit against Harris County alleging excessive force was used against him on 13 February 2006 in the Inmate Processing Center of the Harris County Jail ("IPC"). I have reviewed (1) the videos of the IPC reception area and hallway taken on 13 February 2006 between approximately 1800 hrs. and 1940 hrs., (2) Plaintiff's Original Complaint and (3) Plaintiff's Responses to Defendant's Interrogatories and Request for Production.

6.      At the time of the incident in February 2006 the Sheriff's Office and the IPC had written Use of Force policies which applied to all personnel working in the IPC.  That Use of Force policy required (1) that all personnel fully comply with all applicable state and federal laws; and (2) that personnel use only the minimum amount of force needed to achieve control over an incident or person when the use of force was necessary.

7.      In February 2006 all personnel working in the IPC were required to be licensed peace officers in the State of Texas (deputies) or licensed jailers (detention officers) whose training had met all state-mandated requirements and they had passed the state examinations.  All such personnel had been trained in the care, custody and control of prisoners including being trained in the proper use of force.  Finally, all personnel working in the IPC were trained to know and follow the policies and procedures of the Sheriff's Office and the IPC.

. . .

13.      In my professional opinion, the Sheriff's Office and the IPC had written Use of Force policies in February 2006 which applied to all personnel working in the IPC.  That Use of Force policy required (1) all personnel fully comply with all applicable state and federal laws; and (2) personnel use minimum amount of force needed to achieve control over an incident or person when the use of force was necessary.

14.      In my opinion, the Sheriff's Office and the IPC had policies in February 2006 which required all deputies and detentions officers working in the IPC to be properly trained in the care, custody and

control of prisoners and also trained in the policies and procedures of the Sheriff's Office and the IPC, including the Use of Force policies.

15.     In my opinion, the type and amount of force used to stop the assault and bring Mr. Nazerzadeh under control was entirely reasonable given the level of resistance Mr. Nazerzadeh exhibited and ceased immediately upon Mr. Nazerzadeh being brought under control.  The use of force, in this expert's opinion was entirely proper and met all requirements of Harris County Sheriff's Office policy as well as Texas and federal law.

16.     In my opinion, the unsubstantiated allegations of excessive force used outside of the view of the video cameras in the IPC would be absolutely contrary to the policies and procedures of the Sheriff's Office because those policies clearly prohibit the use of excessive force.  If a jail employee did in fact use excessive force on an inmate in any location it would be in violation of clear Sheriff's Office policy.

17.     All my opinions expressed in this affidavit are based on my training and experience.

(Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 7, pp. 1-3).

The written policies do not support the claim of municipal liability.  Nazerzadeh argues a pattern of excessive force as evidence that Harris County maintained an unwritten policy or custom that permitted the use of excessive force in the jail.  In support, he points to a 2008 newspaper article from the *Houston Chronicle*.  The article stated that a former jailer, Timothy Gough, was charged with aggravated assault for beating two inmates in 2007 in a secluded area of the HCJ ,l/outside the surveillance camera range.  (Docket Entry No. 32, Plaintiff's Response, Ex. 5, p. 1).  The question is whether the prior uses of force Nazerzadeh cites raise a fact issue as to a pattern of excessive force that is "so common and well-settled as to constitute a custom that fairly represents municipal policy."  *Piotrowski,* 237 F.3d at 579 (quoting *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

Prior incidents may show a pattern if they "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster*, 735 F.2d at 842. A plaintiff must show "a pattern of abuses that transcends the error made in a single case." *Piotrowski,* 237 F.3d at 582 (citations omitted). A pattern also requires "sufficiently numerous prior incidents," not "isolated instances." *McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir. 1989). In *Pineda v. City of Houston,* 291 F.3d 325 (5th Cir. 2002), the Fifth Circuit held that eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry. In each of those eleven incidents, officers reported either consent or exigent circumstances. *Id.* at 329 n.12. The Fifth Circuit observed that "[e]leven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces." *Id.* at 329. In *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838 (5th Cir. 2009), an inmate presented evidence that, according to the city's internal affairs records, at least 27 complaints of excessive force were filed between 2002 and 2005. Almost all arose from officers' investigations into petty crimes. The injuries ranged from minor lacerations to broken bones. In concluding that this evidence did not show a pattern, the Fifth Circuit stated as follows:

> The incidents allege use of force that, if true, would be emphatically excessive. Nevertheless, assuming their truth, the incidents do not, on the basis of this record, tell us that the City maintained an official policy of condoning excessive force. The failure of the evidence is that the plaintiffs have failed to provide context that would show a pattern of establishing a municipal policy. For example, the record does not indicate the size of the Fort Worth Police Department or how many arrests were made by the department between 2002 and 2005. We have previously indicated that the size of a police department may be relevant to determining whether a series of incidents can be called a pattern. *Pineda*, 291 F.3d at 329 ("Eleven incidents each ultimately offering equivocal evidence of compliance

43

with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."). Although the record omits any evidence of the department's size or the number of its arrests, the department's own website indicates that it presently employs more than 1,500 officers, and that there were more than 67,000 incidents of crime in the last year alone. Given the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by *Monell*. *See* 436 U.S. at 694, 98 S. Ct. 2018.

Twenty-seven incidents in four years, with no context as to the overall number of arrests or any comparisons to other cities, is not sufficient evidence of a pattern rising to the level of a policy. The burden of providing a context that would show such a pattern falls on the plaintiff, not on the City, and Peterson has failed to meet that burden. No reasonable jury could conclude based on Peterson's evidence that the City had established a municipal policy of using or condoning excessive force.

*Peterson v. City of Fort Worth, Tex.,* 588 F.3d at 852.

The evidence in this record of other instances of excessive force against pretrial detainees in the HCJ similarly lacks the necessary context of the overall number of arrests or any comparisons to other cities. The evidence does not raise a fact issue as to a pattern rising to the level of a policy or custom of using or condoning excessive force against HCJ detainees or inmates.

Nazerzadeh argues that Harris County had a policy of delegating to the Harris County Attorney's Office the decision whether to prosecute jailers who used excessive force. By delegating this responsibility of disciplining these jailers, Nazerzadeh maintains that Harris County condoned the use of excessive force against pretrial detainees. (Docket Entry No. 1, Complaint, p. 3). Nazerzadeh argues that the Sheriff's Department and the Harris County District Attorney's Office,

44

which handles the discipline for sheriff's deputies' uses of excessive force, have emboldened the deputies to continue using excessive force.  In support of this claim, Nazerzadeh offers the expert report of Roger Clark, who stated as follows:

Findings:

1.      Throughout the nation competent jail inmate intake procedures require humane treatment of prisoners.  Additionally, any use of force by a staff officer on a prisoner must be justified as objectively necessary.  Acts of brutality are forbidden policy and law and are codified in federal and state law.  Additionally, if it becomes necessary for staff officers to use force on prisoners, the incident must be reported to the chain of command and investigated by supervisors. Taking Mr. Nazerzadeh's set of facts as true, he suffered an unprovoked and unreported assault by jail staff officers in violation of policy, procedure and law.

2.      The assault that occurred during the intake process caused injuries to Mr. Nazerzadeh that should have been noted and reported by jail custody and medical personnel who surely observed the injuries.  This did not occur.  Additionally, it must be noted that Mr. Nazerzadeh has stated that he also complained directly to the federal judge during an early hearing held after his booking into the Harris County Jail.  Officers who heard Mr. Nazerzadeh's statements in court had a duty to report his allegations to superiors at the jail.  This did not occur.  In fact, Mr. Nazerzadeh has stated that when the judge asked about any video recordings, the officers told the judge, "they had lost the tape."  The statement per se does not appear valid. Finally, the superiors in the jail chain of command who received any such reports had a duty to investigate and secure all germane evidence (such as video recordings taken during his booking process).  This did not occur.

3.      The record thus far (such as it is) is indicative of a custom and practice within the Harris County Jail to look the other way when excessive force occurs, and indicates deliberately lax methods of supervision and oversight that allowed such acts of brutality to occur unabated.  The responsibility for this administrative failure clearly rested on the Sheriff of Harris County and his command staff.  Their individual and collective actions in this case reflected a deliberate indifference and deliberate callous disregard to the life and safety of Mr. Nazerzadeh (and as expressed by POST and quoted below):

45

**"Peace Officer Responsibilities in a Custodial Situation"**
**"Introduction"**

"Peace officers who have custody of arrested persons are lawfully responsible for the care and safekeeping of those individuals."

**"Ethics"**

"The whole process of ensuring the well being of the community at large by depriving an individual of freedom is one of great importance to American democracy.  Misuse of this authority undermines the relationship between law enforcement and the community and undermines our fundamental belief in democratic government.  The actions of an officer who takes someone into custody must always be accomplished in light of an agency's policy and commitment to unbiased policing.  We must ensure that our enforcement activities are applied fairly and equitably throughout our communities." (POST Learning Domain # 31: "Custody,"Chapter 1, page 3.)

**"Officer Liability"**

"Peace officers who have responsibility for arrested persons are liable for the safekeeping and standard of care of those persons."  "Failure to uphold the expected level of care under the provisions of state and federal laws or the **callous disregard** for an arrested person's safety will subject peace officers to:

• departmental discipline (including termination),
• state prosecution for violation of penal code statutes,
• federal prosecution for violation of federal civil rights law, and/or
• civil lawsuits which may include punitive damages levied directly against individual officers." (POST Learning Domain # 31: "Custody," Chapter 1, page 4.)

(Docket Entry No. 33).

The Fifth Circuit considered a similar claim in *James v. Harris Cnty.,* 577 F.3d 612 (5th Cir. 2009).  In that case, the family of a shooting victim argued that Harris County had a policy that allowed officer shootings to be turned over to the District Attorney for his review and appropriate handling.  In *James*, the Fifth Circuit assumed the existence of this as official policy.  The court

46

looked only for evidence of a causal link between that policy and the officer's conduct on the night in question. To show that the alleged policy was the moving force behind the officer's use of force, the plaintiff had to point to or present evidence that the officer understood that it was the official policy to cursorily investigate officer-involved shootings and not impose discipline for excessive force. The officer testified that he was aware that the District Attorney investigated officer-involved shootings. But there was no evidence that the officer knew of the sheriff's purported policy of avoiding a thorough investigation or discipline in officer-involved shootings. The Fifth Circuit stated:

> Thus, to show that the policy was the cause of Wilkinson's use of excessive force, the family was required to establish Wilkinson's knowledge of the policy through other means. To that end, the family sought to establish that a policy of not conducting a thorough investigation of officer-involved shootings was so widely known that it created in the department an expectation of impunity for the use of excessive deadly force, and Wilkinson's personal knowledge reasonably could be assumed. To establish that the policy was widely known, the family relied exclusively on the expert testimony from Dr. David A. Klinger, a criminologist, that line officers tend to break institutional rules if they are not enforced. Dr. Klinger testified that of the 36 investigations of Harris County officer-involved shootings he personally reviewed, a "substantial number" fell below investigatory standards. He then sought to connect those substandard investigations to subsequent officer unjustified shootings by opining that established sociological theory suggested that informal networks of communication serve to inform people at the "bottom of the organization" of what kinds of conduct are permissible. Dr. Klinger's testimony thus sought to establish that the department's deputies would have known that the use of deadly force was not thoroughly investigated and disciplined and, consistent with his theory, would have broken rules governing the use of force. The family argues that on the basis of Dr. Klinger's testimony, a reasonable jury could find that a policy of avoiding thorough investigation of officer-involved
> shootings was so widely known among the department's deputies that Wilkinson's personal knowledge of the policy could be assumed. After a thorough review, we do not find that this testimony supplies

47

the direct causal link to Wilkinson's use of excessive force, because it simply does not connect Dr. Klinger's general theory to Wilkinson's knowledge that the Sheriff had a lax investigation and discipline policy.  The district court accepted Dr. Klinger's expert testimony to the extent it sought to establish that, generally, line workers will break rules if they are not enforced.  But the district court expressly forbade Dr. Klinger from opining that Wilkinson had knowledge of the alleged policy, on the grounds that there was no evidence from which this fact could be established.  The district court further rejected Dr. Klinger's testimony to the extent that it concluded that the alleged policy was widely known among the department's deputies; it reasoned that Dr. Klinger had failed to offer any empirical evidence relating to the Harris County Sheriff's Department that could connect his general theory to the facts of this case.  That is to say, no evidence was offered from which it properly could be inferred that it was common knowledge in the Sheriff's Department, through "informal networks of communication" (to use the expert's words), that the Sheriff's investigation and discipline for officer-involved shootings was lax.  "District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous."  *Watkins v. Telsmith Inc*., 121 F.3d 984, 988 (5th Cir. 1997).  We review a district court's rejection of expert testimony for abuse of discretion. *See, e.g.*, *United States v. Wofford*, 560 F.3d 341, 346 (5th Cir. 2009).

The record supports the district court's conclusion that Dr. Klinger offered no empirical evidence to connect his general theory to the Harris County Sheriff's Department; he never interviewed the department's deputies nor otherwise sought to collect evidence that might reveal whether informal networks of communication operated within the department.  The district court did not abuse its discretion in rejecting those portions of Dr. Klinger's testimony that the alleged policy was widely known.  We conclude by holding that Dr. Klinger's general testimony simply does not supply the direct causal link between the alleged policy and Wilkinson's alleged use of excessive force.  A reasonable jury could not find that the alleged policy was the moving force behind Wilkinson's alleged excessive force, when there was no evidence that Wilkinson had knowledge of such policy.

*James,* 577 F.3d at 618-20.

48

In the present case, the plaintiff's expert, Clark, concluded that Harris County had a policy of looking the other way when excessive force occurred, and that its lax methods of supervision, oversight, and failure to discipline allowed the use of excessive force to continue. Like the expert in *James,* Nazerzadeh's expert witness, Clark, offered no support for these conclusions. Nothing in his reports suggests that he ever interviewed Harris County Sheriff's Department deputies or otherwise sought or obtained evidence of a widely known custom or policy. The evidence simply does not support an inference of a direct causal link between the alleged custom of condoning the use of excessive force and the jailers' alleged use of excessive force.

Nazerzadeh argues that the fact that jailers were not required to file a use-of-force report every time force was used shows a policy of condoning the use of excessive force. (Docket Entry No. 32, Plaintiff's Response, p. 2). Nazerzadeh offers his expert's opinion that this informal policy led jailers to use excessive force against detainees. But the summary judgment evidence shows that Deputy Medina used soft or open-hand control to subdue Nazerzadeh. This is a low degree of force, designed to respond to low levels of resistance. The summary judgment evidence also shows that before the end of the shift on February 13, 2006, Sergeant Araguz viewed the video of the incident. Sergeant Araguz saw Officer Medina calmly escorting Nazerzadeh in the receiving area when Nazerzadeh abruptly started swinging his arms toward Medina. Araguz saw that Medina used open hands to push Nazerzadeh away to keep from being hit. Sergeant Araguz saw other personnel come to help Deputy Medina by restraining Nazerzadeh. Sergeant Araguz did not see any officer hit, strike, or kick Nazerzadeh. After discussing the incident with Deputy Medina, Sergeant Araguz determined that there was no need to complete a Use of Force report because there appeared to be no injuries and he saw no officer

using excessive force in restoring order.  Sergeant Araguz did not instruct Deputy Medina to complete a use-of-force report because the policy did not require one.  Sergeant Araguz decided that no report was needed because the use-of-force policy required a report only if there was an injury or blows or kicks were used.  Otherwise, filing a report was discretionary with the supervising personnel.  Sergeant Araguz saw no need to complete a report on this minor incident based on what he saw on the video, his conversation with Deputy Medina, and his own interaction with Nazerzadeh.

The summary judgment evidence shows that under the applicable policy, whether to report a use of force is up to the supervisor of the officers involved if no injury is seen and no blows or kicks are involved.  (Docket Entry No. 26, Defendant's Motion for Summary Judgment, Ex. 6, pp. 3-4).  The evidence also shows that on February 13, 2006, the IPC personnel were supervised in various ways.  The locations and work assignments of each employee were monitored.   Each employee's performance and conduct were regularly observed by his supervisors.  Each employee received a performance evaluation by a sergeant, twice each year.  Grievances or complaints against any staff personnel were investigated and reviewed by a supervisor.  IPC personnel were subject to discipline if they violated a policy, rule, or regulation of the Harris County Sheriff's Office.  When an employee has violated a policy, such as by excessive use of force, a disciplinary report is generated and set procedures are followed.  The Harris County Sheriff's Office has disciplined deputies and detention officers for excessive use of force, including by job termination.  A major violation or repeated minor violations can result in an employee's termination.  The record does not support an inference of a policy not to report use-of-force incidents or of a casual link to the alleged use-of-force at issue.

Nazerzadeh also alleges that Harris County's conduct following the use of force "ratified" the jailers' conduct.  (Docket Entry No. 1, Complaint, p. 5).  Nazerzadeh relies on *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), to support that argument.  *Grandstaff*, however, has been limited to its facts.  *See Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986) ("The *Grandstaff* panel emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations.").  The court in *Coon* described the facts in *Grandstaff*, which are plainly distinguishable from those at issue here:

> *Grandstaff* . . . does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy.  Rather, *Grandstaff* affirmed a judgment against a Texas city on a highly peculiar set of facts: in response to a minor traffic violation, three patrol cars engaged in a high speed chase during which they fired wildly at the suspected misdemeanant; the object of this chase took refuge on an innocent person's ranch, where the entire night shift of the city police force converged and proceeded to direct hails of gunfire at anything that moved; although nobody except the police was ever shown to have fired a shot, the innocent rancher was killed when the police shot him in the back as he was emerging from his own vehicle; after this "incompetent and catastrophic performance," which involved a whole series of abusive acts, the officers' supervisors "denied their failures and concerned themselves only with unworthy, if not despicable, means to avoid legal liability."

*Coon*, 780 F.2d at 1161 (internal citations omitted).  The differences between the facts in *Grandstaff* and in the present case are obvious.  Here, three officers used a low level of force in response to Nazerzadeh's swinging his fists at a deputy.  In *Grandstaff*, "the entire night shift" directed "hails of gunfire" at someone accused of a minor traffic violation and killed an innocent bystander.

51

Nazerzadeh bases his case on his expert witness, Roger Clark.  More is required under § 1983:

> [W]e have emphasized that, when seeking to prove a municipality's malevolent motive, plaintiffs must introduce more evidence that merely the opinion of an expert witness.  In *Stokes v. Bullins*, 844 F.2d 269 (5th Cir. 1988), the district court relied primarily on the testimony of a single expert witness in holding that the municipality violated § 1983.  We disagreed, remarking that "an expert's opinion should not be alone sufficient to establish constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the inference that the town's motives were contrary to constitutional standards."  *Id*. at 275.

*Snyder v. Trepagnier,* 142 F.3d 791, 799 (5th Cir. 1998).  Nazerzadeh cannot rely solely on Clark to raise a fact issue as to ratification.  *Castro v. McCord*, 259 Fed. Appx. 664, 2007 WL 4467566 (5th Cir. 2007).  Fifth Circuit precedent has limited ratification to "extreme factual situations."  *See Snyder v. Trepagnier,* 142 F.3d 791, 798 (5th Cir. 1998).  Under that precedent, this court cannot say that this case presents an extreme factual situation.  *Compare Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir. 1985) (finding ratification in case in which officers "poured" gunfire onto a truck and killed innocent occupant), with *Snyder,* 142 F.3d at 798 (refusing to find ratification in case in which officer shot fleeing suspect in the back).  The Fifth Circuit has also explained that a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality.  *See Coon v. Ledbetter,* 780 F.2d 1158, 1161-62 (5th Cir. 1986) (the precedent "does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy").  The Supreme Court has cautioned, and the Fifth Circuit has reiterated, that ratification liability must be limited to prevent it from becoming a basis for a municipality's vicarious liability for its

employees.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988).  Nazerzadeh does not

allege or show that the Sheriff of Harris County reviewed the acts of the jailers at issue.  Fifth

Circuit precedent forecloses ratification liability on the basis of the record in this case.

Nazerzadeh also fails to present or point to evidence that Harris County failed to train or

supervise its deputies.  A § 1983 plaintiff may establish a municipal policy or custom by showing

that the municipality failed adequately to train or supervise its officers.  *City of Canton v. Harris,*

489 U.S. 378, 388 (1989).  "[T]he inadequacy of police training may serve as the basis for § 1983

liability only where the failure to train amounts to deliberate indifference to the rights of persons

with whom the police come into contact."  *Id.*  For "liability to attach in this circumstance the

identified deficiency in a city's training program must be closely related to the ultimate injury."

*Id.* at 391.  A plaintiff must prove an affirmative answer to the question, "Would the injury have

been avoided had the employee been trained under a program that was not deficient in the

identified respect?"  *Id.*  "Only where a failure to train reflects a 'deliberate' or 'conscious'

choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a

failure under § 1983."  *Id*. at 389.  The Fifth Circuit has extended *City of Canton* to cover a

plaintiff's allegations that the municipality failed properly to discipline its employees.  *See*

*Piotrowski v. City of Houston,* 237 F.3d 567, 581 (5th Cir. 2001) ("[s]elf-evidently, a City policy

of inadequate officer discipline could be unconstitutional if it was pursued with deliberate

indifference toward the constitutional rights of citizens.").   Isolated incidents of police

wrongdoing alone do not support a finding that training is inadequate.  *Id.* at 391.

Nazerzadeh has not presented or identified evidence of training or supervision

deficiencies that were the moving force behind repeated uses of excessive force.  *Hinojosa v.*

*Butler,* 547 F.3d 285 (5th Cir. 2008).  Nazerzadeh has neither presented nor identified evidence that the jailers' training was inadequate.  Nazerzadeh has failed to point to evidence in the record giving rise to a genuine fact issue as to whether a Harris County custom or policy of inadequate training caused his injuries.  *Deville v. Marcantel,* 567 F.3d 156 (5th Cir. 2009).

Nazerzadeh also argues that Harris County violated his Fourth Amendment rights by subjecting him to an excessive use of force.  Because he was a pretrial detainee, the Due Process Clause of the Fourteenth Amendment controls.  *Hernandez v. Boles,* 184 F.3d 819, 1999 WL 500687 (5th Cir. 1999) (citing *Brothers v. Klevenhagen,* 28 F.3d 452, 455-56 (5th Cir. 1994)).  In *Valencia v. Wiggins,* 981 F.2d 1440 (5th Cir. 1993), the Fifth Circuit listed three factors showing that an individual is a pretrial detainee, rather than someone under arrest.  The factors are whether: (1) "the incidents of arrest [had been] completed"; (2) "the plaintiff had been released from the arresting officer's custody"; and (3) "the plaintiff had been in detention awaiting trial." *Id.* at 1443-44.   Here, all three factors show that Nazerzadeh was a pretrial detainee. Nazerzadeh's claim under the Fourth Amendment is dismissed as a matter of law.

Nazerzadeh alleges that jailers present in the IPC failed to intervene and prevent other officers from using excessive force against him.  (Docket Entry No. 1, Complaint, p. 5).  A prison guard has a duty to intervene to end an assault on an inmate.  *Buckner v. Hollins*, 983 F.2d 119, 122 (8th Cir. 1993); *see also Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citing *Smith v. Dooley*, 591 F. Supp. 1157, 1169 (W.D. La. 1984), *aff'd*, 778 F.2d 788 (5th Cir. 1985)).  An officer may be liable under § 1983 under a theory of bystander liability, if he (1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to

54

prevent harm, and (3) chooses not to act. *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203-04 (4th Cir. 2002).

The summary judgment evidence shows that the alleged use of excessive force lasted less than one minute. Even assuming that other jailers witnessed the use of force against Nazerzadeh, there is no basis to conclude that those jailers had a reasonable opportunity to assess the situation and intervene. Moreover, because the record does not raise a fact issue as to the use of excessive force, Nazerzadeh's claims that other jailers are liable for failing to intervene fail as well. Harris County is entitled to summary judgment on the bystander liability claims.

In sum, Nazerzadeh has not shown a basis to hold Harris County liable under § 1983. Nazerzadeh has not raised a fact issue as to whether the jailers at the HCJ subjected him to an excessive use of force. The record shows that a nurse examined Nazerzadeh soon after the alleged use of force and found no injuries. After he was booked in to the HCJ on February 13, 2006, Nazerzadeh did not complain of being assaulted or that his medical conditions were a result of a beating on February 13, 2006. Nazerzadeh filed no formal grievance over an alleged use of force on February 13. Nor has Nazerzadeh shown any basis to impose municipal liability. Nazerzadeh has not raised a fact issue as to an official policy or widespread pattern or practice that caused the alleged use of excessive force. Nazerzadeh has not raised a fact issue as to whether Harris County's alleged failure to discipline the jailers was undertaken with "deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski,* 237 F.3d at 579, 581 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 407 (1997)); *see also Scott v. Moore,* 114 F.3d 51, 54-55 (5th Cir. 1997) (en banc) (finding no genuine issue regarding city's alleged deliberate indifference when there was "no

55

showing that the city had actual knowledge" that its actions created a risk of harm to the plaintiff and had received no prior complaints regarding the tortfeasor-employee).  To the contrary, the record shows policies limiting the use of force in the jail.  The evidence shows that the jailers involved in the use of force were familiar with the policies, and they were aware of the consequences of failing to adhere to those policies.

The motion for summary judgment as to Nazerzadeh's § 1983 claim against Harris County for the use of excessive force is granted.

## IV.   The Conspiracy Claims

Nazerzadeh alleges that Harris County and its employees conspired to violate his civil rights, in violation of 42 U.S.C. § 1985(3).  To state a cause of action under 42 U.S.C. § 1985(3), a plaintiff must allege that:

> (1) the defendants conspired (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, and (3) one more of the conspirators committed some act in furtherance of the conspiracy; whereby (4) another person is injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States; and (5) the action of the conspirators is motivated by a racial animus.

*Horaist v. Doctor's Hosp. of Opelousas,* 255 F.3d 261, 270 n.12 (5th Cir. 2001) (quoting *Wong v. Stripling,* 881 F.2d 200, 202-03 (5th Cir. 1989)).  Race-based discrimination must be alleged.  *Id.* at 271; *see also Johnson ex rel. Wilson v. Dowd,* 305 Fed. Appx. 221, 224 (5th Cir. 2008) ("In this circuit, we require an allegation of a race-based conspiracy to present a claim under § 1985(3)."); *Bryan v. City of Madison, Miss.,* 213 F.3d 267, 276 (5th Cir. 2000); *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,* 90 F.3d 118, 124 (5th Cir. 1996).  In his complaint,

Nazerzadeh alleged that some jailers asked him if he spoke English.  (Docket Entry No. 1, Complaint, p. 3).  But Nazerzadeh does not allege that the jailers were racially motivated. Nazerzadeh's § 1985(3) claim fails.

The elements of civil conspiracy are (1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right.  *Cinel v. Connick,* 15 F.3d 1338, 1343 (5th Cir.), *cert. denied,* 513 U.S. 868 (1994).  A plaintiff who asserts a conspiracy claim under the civil rights statutes must plead the "operative facts" showing an illegal agreement; "bald allegations" of an agreement do not suffice. *Lynch v. Cannatella*, 810 F.2d 1363, 1369-70 (5th Cir. 1987);  *Arsenaux v. Roberts*, 726 F.2d 1022, 1023-24 (5th Cir. 1982).  The plaintiff may, and often must, rely on circumstantial evidence, because conspiracies "are rarely evidenced by explicit agreements."  *Mack v. Newton*, 737 F.2d 1343, 1350-51 (5th Cir. 1984) (quoting *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir. 1976)).

Nazerzadeh has not alleged facts showing illegal acts or that the defendants entered into an agreement to commit an illegal act.  *See Kerr v. Lyford,* 171 F.3d 330, 341-42 (5th Cir. 1999) (finding that the appellants' civil conspiracy claim was contingent on the success of their malicious prosecution claim).  Nazerzadeh's "bald allegations" that the defendants conspired to use excessive force do not state a constitutional violation.  "It remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient." *Gillum v. City of Kerrville*, 3 F.3d 117,  123 (5th Cir. 1993) (quoting *Villanueva v. McInnis,* 723 F.2d 414, 418 (5th Cir. 1984)).  Additionally, the conspiracy claims fail under the rule that an entity such as a municipality cannot conspire with its own agents or employees.  *Elliott v. Tilton*, 89 F.3d 260,

265 (5th Cir. 1996); *Wilhite v. H.E. Butt Co.*, 812 S.W.2d 1, 5 (Tex. App. - Corpus Christi 1991, no writ) ("As a matter of law, a corporation or other company cannot conspire with itself, no matter how many of its agents participated in the complained of action, . . .").

Harris County is entitled to judgment as a matter of law on the conspiracy claims.

## V.      The State-Law Claims

A federal district court has supplemental jurisdiction over state-law claims that are so closely related to the federal-law claims within its original jurisdiction that they form part of the same case or controversy.  28 U.S.C. § 1367(a).  The federal court may decline to exercise supplemental jurisdiction if it has dismissed the claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).

This court has dismissed Nazerzadeh's federal claims.  The general rule in this circuit is to dismiss state-law claims when the federal claims are dismissed.  *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992).  The dismissal of the supplemental state-law claims is without prejudice, to permit refiling of these claims in state court.  *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999).

Nazerzadeh's federal claims are dismissed with prejudice.  His state-law claims are dismissed without prejudice to refiling in state court.

## VI.     The Claims Against the John Doe Defendants

When Nazerzadeh filed this suit on February 12, 2008, the last day before limitations ran, he sued the officers who allegedly used excessive force, including a United States Marshal, as "John Does" one through ten.  Nazerzadeh did not send Harris County any formal discovery until October 3, 2008, over seven months after filing suit.  It was in the process of responding to the

discovery requests that Harris County first learned that there was a video of Nazerzadeh's booking process.  That video was produced to Nazerzadeh in early March 2009.  Nazerzadeh could not amend his complaint to name the arresting officers.  Any federal claims against the individual officers would be barred unless the claims under Federal Rule of Civil Procedure 15(c) relate back to the original complaint filed on February 12, 2008.  *See Krupski v. Costa Crociere S. p. A.,* --- U.S. ----, 130 S. Ct. 2485, 2496 (2010).

Rule 15(c) states:

(c)   Relation Back of Amendments.

(1)   When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:

(A)   the law that provides the applicable statute of limitations allows relation back;

(B)  the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading; or

(C)  the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i)   received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii)  knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED. R. CIV. P. 15(c).

Rule 15(c)(1)(C)(ii) requires that the newly named defendants "knew or should have known that the action would have been brought against [them], but for a mistake concerning the

59

proper party's identity."  The Supreme Court has recently stated that "[t]he question under Rule 15(c)(1)(C)(ii) is not whether [the plaintiff] knew or should have known the identity of [the newly named defendant] as the proper defendant, but whether [the newly named defendant] knew or should have known that it would have been named as a defendant but for an error.  Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period."  *Krupski, supra,* --- U.S. at ----, 130 S. Ct. at 2493-94 (emphasis in original). Information in the plaintiff's possession is relevant only as it relates to the defendant's understanding of whether there was a mistake concerning the proper party's identity.  *Id.*  The inquiry under Rule 15(c)(1)(C)(ii) is whether the newly named defendant knew or should have known that, but for the plaintiff's mistake, the action would have been brought against him.  *Id.*

If Nazerzadeh tried to name the additional jailers as defendants, he could not show that these individuals received timely notice of this lawsuit, as required by Rule 15(c)(1)(C)(i). Because Nazerzadeh filed suit so late, he could not conduct discovery into the arresting officers' identities before limitations had run.  The record discloses no justification for equitable tolling limitations as to the "John Doe" officers.  In addition, the record shows no basis to find excessive force.  The claims against John Does one through ten are dismissed.  *See Jacobsen*, 133 F.3d at 320.

**VII.   Conclusion**

The motion for summary judgment filed by Harris County, (Docket Entry No. 26), is granted.  Nazerzadeh's federal claims against Harris County and the John Doe defendants are dismissed with prejudice.

Nazerzadeh's state-law claims are dismissed without prejudice.  Any remaining pending motions are denied as moot.

SIGNED on September 27, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge